UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| DORA ESCOBEDO and LYDIA OLIVAREZ | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | No. 1:08-cv-01002 |
| PATRICK J. ROGERS AND AL ROMERO, | § § § § § | |
| Defendants. | § § | |

**PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND SUPPORTING MEMORANDUM**

Plaintiffs Dora Escobedo, et al. ("Plaintiffs") move, pursuant to FED. R. CIV. P. 65(b), for a Temporary Restraining Order enjoining Defendants Patrick Rogers and Alfredo Romero ("Defendants") from threatening or intimidating Plaintiffs or challenging the eligibility of Plaintiffs to cast their ballots in the November 4, 2008 General Election. Defendants' actions against Plaintiffs thus far have violated federal civil rights laws prohibiting voter intimidation and Defendants will continue their illegal acts unless this Court intervenes. In support of this application, Plaintiffs would show as follows:

**I.**

**FACTS**

On October 16, 2008 the New Mexico Republican Party held a press conference to announce that, based on an investigation of 92 voters, it found that 28 voters cast questionable votes in the June 2008 Democratic Primary Election for State Representative in District 13. Defendant Rogers was present at the press conference and spoke to reporters.

That day an Associated Press report quoted Defendant Rogers as stating at the press conference that the information about the questionable voters would be turned over to law enforcement officials for investigation into voter fraud.  *See* Ex. B.

Reporters attending the press conference were given a "press packet" that contained the results of the purported investigation into voter fraud.  According to the press packet, the voters' information "suggests serious questions about the validity of those votes."  *See* Ex. A  (filed under seal).

The press packet continued:   "[t]he information immediately available indicates significant indicia of fraud, identity theft issues or serious identity questions.  The results of the investigation (first 10 summarized below) of all 28 will be provided to the Attorney General, District Attorney and the FBI with a request for a full and immediate investigation."

The press packet further contained information describing ten voters, including Plaintiffs, and included copies of their original voter registration applications that displayed their home addresses, phone numbers, dates of birth, and signatures.  Nine of the ten voters presented in the press packet are Latino; one is African American.

The press packet contained typed notes about each voter regarding "indicia of fraud, identity theft issues or serious identity questions."  *See* Ex. A. at 1-6.  For example, the notations regarding Plaintiff Escobedo included the statement that she might be "a Spanish speaker (only)" and that "No SSN or date of birth is associated with the voter, highly unusual based on a resident of at least 9 years."  *See* Ex. A at 1.  The notations regarding Plaintiff Olivarez included the statement that "The SSN is being used by as many as four people indicating fraud or identity theft.  It is undetermined whether the SSN is assigned to the voter . . ."  *See Id.* at 2.  The

notations further stated that Ms. Olivarez used various "aliases" yet did not hold a New Mexico driver's license. *See Id.*

Plaintiffs Escobedo and Olivarez are eligible voters. Plaintiff Dora Escobedo, age 67, became a naturalized U.S. citizen in 2007 and voted for the first time in the June 2008 Primary Election in Bernalillo County, NM. Plaintiff Lydia Olivarez, age 63, voted in the June 2008 Primary Election in Bernalillo County, NM and had registered to vote on February 28, 2008, after moving to New Mexico from California.

On Wednesday, October 22, 2008, Plaintiff Escobedo received an uninvited visit from Defendant Romero, who represented himself as an official investigator. *See* Ex. C. Romero claimed that he was investigating problems with Mrs. Escobedo's voter registration and repeatedly asked her to let him into her house. She refused.

After several unsuccessful attempts to gain access to Ms. Escobedo's home, Defendant Romero showed Mrs. Escobedo a copy of her voter registration form and demanded information about her voter registration, as well as to see her identification card. When she objected to his request, Defendant Romero accused her of not being a U.S. citizen and threatened to report her to immigration authorities. Romero also laughed at Mrs. Escobedo when she said she would show her naturalization certificate to any authorities who came to investigate her.

Mr. Romero remained outside Mrs. Escobedo's house for approximately one hour during which Mrs. Escobedo called her son and daughter for help. When Mrs. Escobedo gave her phone to Mr. Romero so that he could speak to her daughter, Mr. Romero said that he was conducting an investigation for Bernalillo County and warned repeatedly that Mrs. Escobedo should not vote if she was ineligible. When pressed, Romero finally stated that he had been hired by an attorney named Pat Rogers. *See* Ex. D.

3

That same day Defendant Romero similarly paid an unannounced visit to the residence of Plaintiff Olivarez, who was not home at the time. Another resident of the house sent Defendant Romero away and contacted Plaintiff Olivarez to report the visit. *See* Ex. E.

Plaintiffs Escobedo and Olivarez are deeply upset that they have been publicly associated with voter fraud, that their personal and confidential information has been released without their consent, and that someone has come to their homes to investigate them. *See* Ex.s C, D and E. After the visit from Defendant Romero, Plaintiff Escobedo, who suffers from diabetes, felt ill from an increase in her blood sugar and was still crying when her daughter visited her several hours later. *See* Ex. D. Plaintiffs feel that they have been harassed and their privacy invaded. *See* Ex.s C, D and E.

Plaintiffs face the continued distribution by Defendants of their personal and confidential information, the continued association of their names with voter fraud, the continued threat of visits at their homes from Mr. Romero, and the questioning of their ability to vote on November 4, 2008. For the General Election, Plaintiffs Escobedo and Olivarez have mailed completed mail ballots to the Bernalillo County Clerk but those ballots will not be opened and counted until 7pm on November 4. Because they are mail ballots, they can be identified as coming from Plaintiffs Escobedo and Olivarez until they are opened and counted on Election Day. Plaintiffs face the continued threat that Defendants' accusations will result in their mail ballots being pulled from the collection of absentee ballots and investigated as potentially fraudulent.

Plaintiffs Escobedo and Olivarez seek an emergency order of the Court protecting them from further harassment and intimidation on the basis of their participation in registering and voting.

## II.

## ARGUMENT

**A.    Temporary Injunction Standard**

The purpose of a temporary restraining order is to preserve the relative positions of the parties until the Court holds a trial on the merits.  *See University of Texas v. Camenisch,* 451 U.S. 390, 395 (1981); *Hartford House, Ltd. v. Hallmark Cards, Inc.,* 846 F.2d 1268, 1270 (10th Cir. 1988).  A temporary restraining order is not meant to be a preliminary adjudication of the case, but a means to preserve the status quo and prevent irreparable harm before the Court issues its final judgment.  *See Resolution Tr. Corp. v. Cruce,* 972 F.2d 1195, 1198 (10th Cir. 1992); *Buca, Inc. v. Gambucci's, Inc.,* 18 F.Supp.2d 1193, 1200 (D. Kan. 1998); *Tri-State Generation & Transmission Ass'n., Inc. v. Shoshone River Power, Inc.,* 805 F.2d 351, 355 (10th Cir. 1986).

Plaintiffs here satisfy the requirements necessary for this Court to issue a temporary restraining order under Fed. R. Civ. P. 65, and demonstrate below that (1) there is a substantial likelihood of success on the merits; (2) they will suffer irreparable injury unless this Court issues an injunction; (3) the threatened injury outweighs any damage the injunction may cause Defendants; and (4) the injunction would not be adverse to the public interest. *See Schrier v. University of Co*.  427 F.3d 1253, 1258 (10th Cir. 2005).

**B.    Plaintiffs have met the Requirements for a Temporary Injunction**

1. <u>Likelihood of Success on The Merits</u>
    <u>a. Plaintiffs are likely to succeed on their claims brought under § 1971(b) and § 1973i(b)</u>

Both federal statutes 42 U.S.C. § 1971(b)  and 42 U.S.C. § 1973i(b)  prohibit voter intimidation, harassment and coercion.  The statutes are similarly drafted and as a result are often

mentioned together as the federal statues that cover the subject area of voter intimidation. *See, e.g., U.S. v. Madden,* 403 F.3d 347, 352 (6th Cir. 2005).

§ 1971(b) provides:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for the office of President, Vice President, presidential elector, Member of the Senate, or Member of the House of Representatives, Delegates or Commissioners from the Territories or possessions, at any general, special, or primary election held solely or in part for the purpose of selecting or electing any such candidate.

§ 1973i(b) states:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 1973a (a), 1973d, 1973f, 1973g, 1973h, or 1973j (e) of this title.

The main distinction between the two statutes is that § 1971(b) requires proof of intent to interfere with the right to vote; § 1973i(b) does not share that standard. *See* H.R.Rep. No. 89-439, at 30 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 2462. In this case, the facts satisfy the requirements of both statutes.

Defendant Rogers participated in a public event that announced that Plaintiffs were connected with voter fraud and at which a press packet was distributed containing the names and personal information of Plaintiffs, as well as purported investigative notes linking Plaintiffs to accusations of identity theft and voter fraud. Defendant Rogers further announced that he would give this information about Plaintiffs to local and federal authorities for a criminal investigation into voter fraud.

Shortly after Defendant Rogers' announcement, Defendant Romero personally visited Plaintiffs' residences, without invitation, on behalf of Mr. Rogers.  At Plaintiff Escobedo's home, Mr. Romero claimed to be conducting an official investigation, accused Plaintiff Escobedo of being ineligible to vote because she was not a U.S. citizen, demanded to see her identification, and threatened to call the authorities to investigate her for illegal voting. Defendants have made clear that their actions towards Plaintiffs are based on Plaintiffs having registered to vote and voted in the June 2008 Primary Election as well as the possibility that Plaintiffs will vote in the General Election.  Plaintiffs feel harassed, intimidated and invaded because they registered and voted.

The facts above demonstrate that Defendants have engaged in harassing and intimidating behavior towards Plaintiffs because they registered and voted.  Furthermore, Defendants have harassed and intimidated Plaintiffs in the days leading up to Plaintiffs' next opportunity to vote -- the November 4, 2008 General Election.

It is well settled that voting is a fundamental right.  The right to vote is "preservative of all rights" of Americans.  *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *Burson v. Freeman,* 504 U.S. 191, 214 (1992) (Kennedy, J., concurring) ("Voting is one of the most fundamental and cherished liberties in our democratic system of government.").  As the Supreme Court explained in *Reynolds v. Sims,* "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."  377 U.S. 533, 555 (1964).  Because of the fundamental nature of the right to vote, courts give the language of the Voting Rights Act of 1965 "the broadest possible scope." *Allen v. Board of Elections*, 393 U.S. 544, 565-66 (1969).

Voter intimidation is "an obvious harm that federal law strongly and properly prohibits." *U.S. v. Madden*, 403 F.3d 347 (6th Cir. 2005). Congress enacted 42 U.S.C. § 1973i(b) as part of a host of measures aimed at protecting voters from official, as well as private acts that interfered with the full exercise of the right to vote. *See Dougherty County, Georgia, Bd. of Ed. v. White*, 439 U.S. 32, 50 fn. 4 (1978) ("To this end, Congress imposed an unlimited proscription on activities affecting the voting rights of others by making it a crime under § 11 of the Act for anyone to 'intimidate, threaten, or coerce any person for voting . . . or for urging . . . any person to vote.' 42 U.S.C. § 1973i(b)."); *City of Greenwood, Miss. v. Peacock*, 384 U.S. 808, 843 fn 10 (42 U.S.C. s 1973i(b) is one of "[v]arious federal statutes [that] make it a crime to interfere with or punish the exercise of federally protected rights.").

The voter intimidation provisions of the Voting Rights Act are plain on their face. For example, 42 U.S.C. 1971(b) "essentially requires proof of two ultimate facts: (1) that there was an intimidation, threat, or coercion, or an attempt to intimidate, threaten or coerce, and (2) that the intimidation was for the purpose of interfering with the right to vote." *U.S. v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967).

Voter intimidation includes interfering with voter registration as well as casting a ballot on Election Day. See 42 U.S.C. 1973l (c) (1) ("The terms "vote" or "voting" shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration . . . or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly . . ."). *See also*, *U.S. v. McLeod*, 385 F.2d at 740 ("Registration is 'a critical, inseparable part of the electoral process which must necessarily concern the United States since registration to vote covers voting in federal as well as in state

elections.") quoting *United States v. State of Louisiana*, E.D.La.1963, 225 F.Supp. 353, *aff'd* 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965).

Acts of voter intimidation can be as varied as arrest and prosecution, such as that described in *McLeod*, *supra*, economic intimidation in the form of evicting tenants or refusing to deal with tenants in good faith, invoking trespass law to prevent voter registration advocates from entering private property and failing to renew a teaching contract because , *See U.S. Beaty*, 288 F.2d 653 (6th Cir. 1961);

The fact that Plaintiffs are properly registered and eligible voters strengthens the conclusion that Defendants' acts were intimidation and harassment as opposed to any claimed legitimate attempt to expose voter fraud. *See U.S. v. McLeod*, 385 F.2d at 744. Finally, whether Defendants prevent Plaintiffs from voting is not dispositive, since the attempt to interfere with voting by itself constitutes a violation. *See U. S. v. Clark*, 249 F.Supp. 720, 728 (S.D. Ala. 1965) ("The inevitable effect of such acts and conduct is to severely discourage, intimidate, threaten and coerce those citizens who are seeking or might otherwise seek to exercise the rights involved. This is precisely the type of conduct proscribed by . . . Section 1971(b). The success or failure of intimidation, threats or coercion, is immaterial, since 'attempts' are equally proscribed.").

As demonstrated above, Defendants' actions demonstrate, under the plain language of the statute, a violation of the prohibition against threatening and harassing voters.

### b.  Plaintiffs are likely to succeed on their claims brought under 42 U.S.C 1985(3).

Plaintiffs' likelihood of success under their third cause of action, 42 U.S.C. 1985(3), is equally strong as that shown for the Voting Rights Act claims described above. 42 U.S.C. 1985(3) prohibits, in relevant part:

> two or more persons conspir[ing] to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States . . .

The intimidation perpetrated against Plaintiffs by Defendants has been discussed at length above, as well as Plaintiffs' qualifications to vote and their hope to participate in the upcoming November 4, 2008 General Election.  Defendant Romero was clear in his statement, while threatening and harassing Plaintiff Escobedo, that he worked for and on behalf of Defendant Rogers.  Thus, Defendants acted in concert and conspired to intimidate Plaintiffs and interfere with Plaintiffs' right to vote.

    2. <u>Plaintiffs Will Suffer Irreparable Harm</u>

Any "[a]bridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury." *Cardona v. Oakland Unified School Dist.*, 785 F.Supp. 837, 840 (N.D.Cal.1992) (citing *Reynolds v. Sims,* 377 U.S. 533, 562 (1964)0 (other internal citations omitted).  If Defendants are not enjoined from continuing to harass and intimidate Plaintiffs, who are qualified voters, there is a strong likelihood that Plaintiffs will continue to suffer:  the exposure of their personal and confidential information to the public; the fear that Defendatn Romero will appear again at their homes to intimidate them; and the fear that their mail ballots will be challenged by Defendants or those whom Defendants have convinced that Plaintiffs are committing voter fraud.  Plaintiffs, both newly registered voters, are very upset and frustrated that their attempt to participate in the political system has resulted in public accusations and an invasion of their private lives.  Without an injunction from the Court, Plaintiffs will be forced to abandon their right to vote or face continued harassment and intimidation.

    3. <u>The Balance of Harm Favors Granting The Preliminary Injunction</u>

10

The threat of irreparable harm to Plaintiffs far outweighs any interest Defendants may argue they have in continuing their harassing behavior towards Plaintiffs.  A temporary restraining order issued by this Court would have no harmful effect on Defendants.  By refraining from further accusations, disclosures of private information and visits to Plaintiffs' homes, Defendants will suffer no economic impairment or emotional damage.  The fact that Plaintiffs are qualified voters removes any interest of Defendants in targeting Plaintiffs for investigation of voter fraud.  Thus, the balance of harms decidedly favors Plaintiffs.

    4.  <u>The Public Interest Favors Granting the Preliminary Injunction</u>

The public interest is served in this case by ensuring that Plaintiffs' fundamental right to vote is protected in the days leading up to the November 4 election.  On the other had, the public interest has not been served by Defendants' harassment of eligible voters.   When qualified voters are able to cast their ballots without impediment, and trust that their votes will be counted without interference or intimidation the public interest is served.  Unwarranted accusations of voter fraud and voter harassment disserve the public interest and tear at the very fabric of democracy.

**III.**

**PLAINTIFFS SHOULD BE REQUIRED TO POST NO OR ONLY A NOMINAL BOND**

The amount of a security bond, if any, required as a condition for injunctive relief is clearly a matter resting within the sound discretion of the Court.  The Court may dispense with the requirement of a bond altogether where the relief requested is in the public interest or there is no true harm to the adverse party.  *See Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987); *Continental Oil Co. v. Frontier Refining Co.,* 338 F.2d 780, 782 (10th Cir. 1964); *see also Moltan Co. v. Eagle-Picher Indus., Inc.,* 55 F.3d 1171, 1176 (6th Cir.1995) (no bond is required because the defendants will not be damaged by preliminary

11

injunction and strong public interest question involved). In this case Plaintiffs urge the court to dispense with the bond requirement or at most require only a nominal bond.

## IV.
## PRAYER

WHEREFORE, Plaintiffs pray that the Court grant their Application immediately to: enjoin Defendants, their officers, agents, employees and all persons in active concert with them, from undertaking activities which are designed to intimidate, threaten or coerce voters concerning their right to vote or which are designed to in any way interfere with or discourage lawful exercise of the franchise; and enjoin Defendants, their officers, agents, employees and all persons in active concert with them, from undertaking activities to challenge the validity or legitimacy of Plaintiffs' votes cast in the November 4, 2008 General Election or the June 2008 Primary Election.

DATED:   October 29, 2008                    Respectfully submitted,

                                                                      /s Nina Perales
**Nina Perales**
TX State Bar No. 24005046
**Diego M. Bernal**
TX State Bar No. 24048350
**Mexican American Legal Defense and**
**Educational Fund, Inc.**
110 Broadway, Suite 300
San Antonio, TX 78205
(210) 224-5476; (210) 224-5382 Fax

Joseph Sapien
Phillip Sapien
SAPIEN LAW, L.L.C.
P.O. Box 965
Albuquerque, NM 87103-0965
(505) 842-5979
(505) 842-6002 Fax

**Attorneys for Plaintiffs**